13-3687-cr (L)
*United States v. Pierce*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2014

(Argued:     October 17, 2014          Decided:     May 11, 2015)

Docket Nos. 13-3687-cr, 13-3930-cr, 13-3936-cr

UNITED STATES OF AMERICA,

*Appellee,*

v.

EARL PIERCE, aka Sealed Defendant 3, aka Skeet Box, MELVIN COLON, aka Sealed Defendant 2, aka Melly, JOSHUA MEREGILDO, aka Sealed Defendant 1, aka Killa,

*Defendants-Appellants,*

NOLBERT MIRANDA, aka Sealed Defendant 4, aka PayDay, LEBITHAN GUZMAN, aka Sealed Defendant 5, aka Levi, AUBREY PEMBERTON, aka Sealed Defendant 6, aka Au, FELIPE BLANDING, aka Sealed Defendant 7, aka Hump, JAVON JONES, aka Sealed Defendant 8, aka Capo, DANTE BARBER, aka Sealed Defendant 9, aka Tay, NATHANIEL FLUDD, aka Juntao, ORFELINA BRITO, aka Becky, KEVIN PINERO, aka SB, TOSHNELLE FOSTER, aka Tosh, BERNARD FOLKS, aka Akon, HASSEN BRITO, aka 12, ENRIQUE BRITO, aka 13, WALTER APONTE,

*Defendants.*\*

---

＊          The Clerk of Court is respectfully requested to amend the caption as set forth above.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT

Before:

KEARSE, WESLEY, AND CHIN, *Circuit Judges*.

——————————

Appeals from judgments of the United States District Court for the Southern District of New York (Pauley, *J.*), convicting defendants-appellants of, *inter alia*, conspiracy, racketeering, murder, narcotics trafficking, and firearms offenses. Defendants-appellants raise several issues on appeal: the sufficiency of the evidence, the admissibility of a rap video and images of tattoos posted on a defendant's Facebook page, the constitutionality of certain sections of the Stored Communications Act, 18 U.S.C. §§ 2702-2703, the propriety of certain of the district court's jury instructions, and whether the rule of lenity applies to the district court's sequencing of sentences on multiple firearms convictions.

**AFFIRMED** in part and **REMANDED** in part.

——————————————

NOLA B. HELLER, Assistant United States
Attorney (Adam Fee, Santosh Aravind,
Brian A. Jacobs, Assistant United States
Attorneys, *on the brief*), *for* Preet Bharara,
United States Attorney for the Southern

District of New York, New York, NY, *for Appellee*.

GWEN M. SCHOENFELD, Law Office of Gwen M. Schoenfeld, LLC, New York, NY, *for Defendant-Appellant Earl Pierce*.

MITCHELL DINNERSTEIN, New York, NY, *for Defendant-Appellant Melvin Colon*.

YING STAFFORD, New York, NY, *for Defendant-Appellant Joshua Meregildo*.

_____

CHIN, *Circuit Judge*:

Defendants-appellants Earl Pierce, Melvin Colon, and Joshua Meregildo appeal from judgments of conviction entered in the United States District Court for the Southern District of New York (Pauley, *J.*) on September 25, 2013, following a jury trial at which they were found guilty of, *inter alia*, conspiracy, racketeering, murder, narcotics trafficking, and firearms offenses. The district court sentenced Pierce principally to 600 months' imprisonment, Colon principally to life plus 420 months' imprisonment, and Meregildo principally to life plus 60 months' imprisonment.

Defendants raise the following issues on appeal: the sufficiency of the evidence as to certain counts, the admissibility of a rap video and images of

tattoos posted on a defendant's Facebook page, the constitutionality of certain sections of the Stored Communications Act, 18 U.S.C. §§ 2702-2703 (the "SCA"), the propriety of certain of the district court's jury instructions, and whether the rule of lenity applies to the district court's sequencing of sentences on multiple firearms convictions under 18 U.S.C. § 924(c).

We affirm the district court in all respects, with one exception. We remand for resentencing with respect to Pierce's firearms convictions, in accordance with the rule of lenity.

## STATEMENT OF THE CASE

**A.** *Summary of the Facts*

Viewed in the light most favorable to the government, *United States v. Vitale*, 459 F.3d 190, 191 (2d Cir. 2006), the evidence established the following:

Pierce, Colon, and Meregildo were members of a violent street gang, dubbed the Courtlandt Avenue Crew ("CAC") by the government, that engaged in the trafficking of crack cocaine, heroin, and marijuana in and around the Melrose Public Housing Developments and the Andrew Jackson Houses (the "Melrose-Jackson Houses") in the Melrose section of the Bronx. CAC was formed in 2010 by Terry Harrison, who recruited young men around the Melrose-

- 4 -

Jackson Houses to sell drugs, many of whom -- including Meregildo and Colon -- were already members of another gang, known as God's Favorite Children, or "GFC."

Harrison was shot and killed in 2010 by an individual working for the rival "321 Organization." After Harrison's murder, Meregildo assumed a leadership role in CAC, providing crack cocaine to the street dealers until he was arrested in January 2011. After Meregildo was arrested, Colon took over some of the narcotics operations, supplying crack cocaine to members of CAC as well as to its customers. Colon was arrested on the current charges in September 2011. In addition to their involvement in the extensive narcotics sales, Pierce, Meregildo, and Colon also actively participated in violence perpetrated against rival gangs and suspected law enforcement informants on behalf of CAC.

**B.**    *The Proceedings Below*

Pierce, Colon, and Meregildo were charged along with more than a dozen other alleged members and associates of CAC, in an indictment filed June 4, 2012. The two-month trial commenced on October 1, 2012.

As part of its case-in-chief, the government called forty witnesses, including six cooperating witnesses. Five of the cooperating witnesses were

former members of CAC who testified about the participation of Pierce, Meregildo, and Colon in the narcotics trafficking and violence. The government also offered physical evidence, including seized drugs, drug paraphernalia, and firearms used in the commission of the murders.

Additionally, the government introduced into evidence social media posts by members of CAC, which alluded to the narcotics sales and violent acts, including a rap video from Colon's Facebook page and photographs of his tattoos.

The district court charged the jury on November 28, 2012. The district court delivered an uncalled witness instruction, without making the modifications Meregildo had requested in the charge conference. The jury began its deliberations. The next day, November 29, the jury sent the court a note asking "[a]s related to [Count Fifteen],[1] is the conspiracy limited to the Courtlandt Avenue [C]rew? Or working together or in concert with the Courtlandt Avenue Crew?" Trial Transcript ("Tr.") 6462. After hearing from both parties on the appropriate response, the district court instructed the jury -- over defense

---

[1] The government redacted the indictment at trial and renumbered the remaining counts in the verdict sheet to remove those counts in which the defendants were not charged. We refer here to the counts as they appear in the non-redacted indictment.

objections -- that Count Fifteen "does not allege that membership in the narcotics conspiracy requires membership in the Courtlandt Avenue Crew." *Id.*

On December 4, 2012, the jury returned guilty verdicts against the defendants on multiple counts. All three defendants were convicted of racketeering (Count One), racketeering conspiracy (Count Two), conspiracy to distribute narcotics (Count Fifteen), and possession of a firearm in furtherance of a drug-trafficking offense (Count Twenty-Eight).

Pierce was also convicted of conspiracy to murder in aid of racketeering (Count Three), a crime of violence in aid of racketeering (Count Eleven), and discharging a firearm in furtherance of a crime of violence (Count Twenty-Four). Colon was also convicted of, *inter alia*, conspiracy to murder and murder in aid of racketeering (Counts Seven, Eight, and Twelve), assault and attempted murder in aid of racketeering (Count Fourteen), and murder in connection with a drug-trafficking offense (Count Eighteen). Meregildo was also convicted of, *inter alia*, conspiracy to murder and murder in aid of racketeering (Counts Five and Six), and murder in connection with a drug-trafficking offense (Count Seventeen).

All three defendants moved for judgments of acquittal and a new trial pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure. Their motions were denied, and defendants were sentenced as set forth above.

These appeals followed.

## *DISCUSSION*

Defendants present the following issues on appeal: (a) the sufficiency of the evidence with respect to certain counts as to Meregildo and Colon; (b) the admissibility of video and tattoo evidence as to Colon; (c) the constitutionality of the SCA as applied to Colon; (d) the propriety of certain of the district court's jury instructions as to all three defendants; and (e) the calculation of Pierce's sentence.

### A.    *Sufficiency of the Evidence*

We review challenges to the sufficiency of evidence *de novo*. *United States v. Harvey*, 746 F.3d 87, 89 (2d Cir. 2014) (per curiam). A defendant "bears a heavy burden" because "we view the evidence in the light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility." *Id.* (internal quotation marks omitted). We will sustain the jury's verdict if "*any* rational trier of fact could have

found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

**1.** *Meregildo*

Meregildo challenges the sufficiency of the evidence with respect to whether: CAC was an association-in-fact enterprise as contemplated by RICO; he was a part of the alleged narcotics conspiracy; he was involved in the murder of Carrel Ogarro; and Ogarro's murder was in furtherance of the RICO enterprise or for pecuniary gain.

The thrust of Meregildo's principal argument is that the evidence at trial established merely random acts of violence in the vicinity of the Melrose-Jackson Houses, rather than "the organization, continuity, structure or intent of an 'enterprise' as intended under RICO."  Meregildo Brief ("Br.") 38.  Specifically, he argues that the government failed to prove that CAC had the requisite hierarchy to satisfy the enterprise element of RICO; CAC lacked sufficient longevity to pursue the enterprise's purpose; and the government failed to establish the separate existence of an enterprise as something distinct from the predicate acts.  These arguments fail, both legally and factually.

First, as a matter of law, the requirements for proving a racketeering enterprise are not so rigid as Meregildo contends. As the Supreme Court noted in *Boyle v. United States*, "an association-in-fact enterprise is simply a continuing unit that functions with a common purpose. Such a group need not have a hierarchical structure or a 'chain of command.'" 556 U.S. 938, 948 (2009). Moreover, there is no hard-and-fast time period for satisfaction of the longevity prong. "Continuity is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition" *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241 (1989) (internal quotation marks omitted). Finally, "the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.'" *Boyle*, 556 U.S. at 947 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).

Second, as a factual matter, the evidence was sufficient to establish that CAC was an enterprise. A cooperating witness testified that the crew had guns "[t]o protect us from our beefs, our problems with other neighborhoods and other crews." Tr. 637. Related testimony established that the crew had a base of operations on Courtlandt Avenue near the Melrose-Jackson Houses, members

had tattoos and signs that signified their membership, and numerous crimes were committed by CAC members in furtherance of the enterprise, including the murders of Jason Correa, Carrel Ogarro, and Delquan Alston. The evidence was sufficient to permit a rational juror to infer that Harrison and the other members of the crew "joined in the shared purpose of selling drugs and promoting such sales." *United States v. Burden*, 600 F.3d 204, 215 (2d Cir. 2010). Hence, the government's evidence established that CAC was a continuing unit that functioned with a common purpose: the illicit sale of narcotics in and around the Melrose-Jackson Houses.

We conclude further that sufficient evidence was presented at trial to show that Meregildo was a participant in the alleged narcotics conspiracy. Four cooperating witnesses, for example, testified that they had purchased marijuana from Meregildo, and two of them testified that they observed Meregildo receiving marijuana from Harrison. One of the cooperating witnesses testified that Meregildo supplied him, as well as other GFC members, with crack cocaine to sell, and that Meregildo assumed a leadership role in the narcotics conspiracy after Harrison's murder. Another cooperating witness testified that Meregildo gave him bags of crack cocaine for distribution on multiple occasions.

- 11 -

And a third cooperating witness testified that after Harrison's death he observed Meregildo breaking up pieces of crack cocaine and packaging it in small baggies. The trial testimony of these primary cooperating witnesses was sufficient to establish that Meregildo "knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *United States v. Rahman*, 189 F.3d 88, 123 (2d Cir. 1999) (internal quotation marks omitted).

Finally, Meregildo contends that the evidence was insufficient to prove that he murdered and conspired to murder Carrel Ogarro or that he did so in aid of the enterprise or for pecuniary gain. Meregildo points to evidence that Ogarro was in fact murdered by the cooperating witness Devin Parsons, possibly because of a personal problem Ogarro was having with Walter Aponte. Parsons, however, testified that Meregildo shot Ogarro at Harrison's direction, due to Harrison's suspicion that Ogarro was "snitching" with regards to CAC's activities. Tr. 2301. Parsons described how, in July 2010, he, Meregildo, and Aponte waited for Ogarro near the Melrose-Jackson Houses basketball court, and how he and Meregildo both fired their guns at Ogarro, hitting him repeatedly. He also testified that Harrison promised Meregildo and Parsons $5,000 to kill Ogarro.

Meregildo argues that Parsons' testimony was contradicted by forensic evidence and other testimony. But the jury could have reasonably rejected Meregildo's contentions and accepted the government's proof, and apparently it did so. Thus, the evidence was sufficient to permit the inference that Meregildo was a member of the alleged narcotics conspiracy and that he participated in the murder of Ogarro in aid of the CAC enterprise.

### 2. *Colon*

Colon argues that the evidence presented at trial was insufficient for the jury to find him guilty of murdering Delquan Alston while engaged in the narcotics conspiracy, in violation of 21 U.S.C. § 848(e)(1)(A), though Colon does not challenge the sufficiency of the evidence with respect to his committing the underlying murder.

We have held that Section 848(e)(1)(A) liability does not require active involvement in drug distribution. *United States v. Santos*, 541 F.3d 63, 65, 73 (2d Cir. 2008) ("That [the defendant] did not participate in the narcotics conspiracy in some way other than carrying out the murders does not undermine the sufficiency of the evidence that he was a co-conspirator."). "[T]he government need only prove beyond a reasonable doubt that *one* motive for the

killing . . . was related to the drug conspiracy." *United States v. Desinor*, 525 F.3d 193, 202 (2d Cir. 2008) (emphasis in original).

Parsons testified that on August 27, 2010, he and Colon shot and killed Alston.  Parsons was at a restaurant in the Bronx with Harrison and Colon when Harrison told Colon that Alston was selling fake crack cocaine to CAC customers, and that Alston was rumored to be a law enforcement informant. Harrison asked Colon and Parsons to kill Alston, promising to pay them.  On the night of the murder, Colon, Parsons, and Alston sat on a bench and talked near a Courtlandt Avenue apartment building.  Parsons asked Alston to go buy some rolling paper for marijuana.  Parsons and Colon followed him as he walked to the store.  On the way, Alston stopped to urinate against the wall of a building. When he turned back around, Colon shot him in the head with a .40 caliber pistol that Parsons had given to him.

Though Colon does not dispute that he murdered Alston, he points to testimony by a government witness that he told someone he met in pretrial detention that he killed Alston not as part of a contract murder, but because Alston threatened to kill one of Colon's friends.  Colon also contends that he could not have been a part of the narcotics conspiracy because he was released

from juvenile detention only a month before Harrison's death, and that he was selling drugs independently from CAC, and often in direct competition with CAC. At trial, however, the government presented contrary evidence, including the evidence described above that Colon killed Alston at Harrison's request because Alston's actions were threatening CAC's narcotics activity. Hence, the jury could have rationally inferred that Colon had the requisite intent to commit the murder in aid of the drug trafficking conspiracy. *See Santos*, 541 F.3d at 73.

**B.** *The Video and Tattoo Evidence*

Colon contends that his First Amendment rights were violated when the district court permitted the government to present as evidence a rap video and images of his tattoos, some of which he had posted to his Facebook page. Though we ordinarily review evidentiary rulings for abuse of discretion, because Colon failed to raise these objections at trial we review the admission of this evidence for plain error. *See United States v. Fell*, 531 F.3d 197, 209 (2d Cir. 2008).

The district court admitted into evidence a video that was made in December 2011 in the Melrose-Jackson Houses and depicted Colon, a cooperating witness Aubrey Pemberton, and a number of GFC members. In the video, Colon is seen rapping: "YG to OG / Somebody make somebody nose bleed

/ I'm OG shoot the Ruger / I'm a shooter." Tr. 2134-36. At trial, Pemberton served as a guide through the lyrics, testifying that the Young Gunnaz crew, or YG, was feuding with the OG (formerly the GFC). The video helped establish Colon's association with members of the enterprise and his motive to participate in the charged conduct against members of the Young Gunnaz.

The district court also allowed the government to offer photographs of Colon's tattoos, some of which he had posted on his Facebook page. One of the photographs was a close-up of Colon's hand, showing his "Y.G.K." tattoo, which stands for "Young Gunnaz Killer." In some of the photographs Colon is pointing a gun at his Y.G.K. tattoo, indicating, according to the government, his desire to harm members of the Young Gunnaz. Other tattoos depicted in the photographs introduced at trial included one on his right arm that read "Courtlandt"; tattoos on his left arm that referenced Meregildo's nicknames ("Young" and "Killa"); and one stating "M.I.P. [Mac In Peace] T-Money," referring to Harrison, the former leader of CAC.

Colon argues that the admission of the rap video and tattoo images violated his First Amendment rights because courts should not "sustain a conviction that may have rested on a form of expression, however distasteful,

- 16 -

which the Constitution tolerates and protects." *Street v. New York*, 394 U.S. 576, 594 (1969). This challenge is meritless, however, because here the speech is not "itself the proscribed conduct." *United States v. Caronia*, 703 F.3d 149, 161 (2d Cir. 2012). The speech was not the basis for the prosecution, but instead it was used to establish the existence of, and Colon's participation in, the alleged RICO enterprise. *See Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) ("The First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent."); *United States v. Salameh*, 152 F.3d 88, 112 (2d Cir. 1998) (per curiam).

Colon also argues that the rap lyrics were merely "fictional artistic expressions" and "perverse puffery" that should not have been admitted against him. Indeed, in *State v. Skinner*, the New Jersey Supreme Court recently overturned a conviction where the state's case at trial relied heavily on violent rap lyrics, as the court observed that "[o]ne would not presume that Bob Marley, who wrote the well-known song 'I Shot the Sheriff,' actually shot a sheriff." 218 N.J. 496, 521 (2014). Rap lyrics and tattoos are properly admitted, however, where they are relevant and their probative value is not substantially outweighed by the danger of unfair prejudice. *See United States v. Moore*, 639

- 17 -

F.3d 443, 447-48 (8th Cir. 2011) (affirming admission of profane and violent rap recordings over Fed. R. Evid. 403 challenge where lyrics were probative of defendant's participation in narcotics conspiracy); *United States v. Belfast*, 611 F.3d 783, 820 (11th Cir. 2010) (holding that rap lyrics were relevant and their probative value not substantially outweighed by any unfair prejudice in case where lyrics were used to show that defendant was associated with his father Charles Taylor's Anti-Terrorism Unit, which tortured Sierra Leoneans in Liberia).

The government proffered the rap video to show Colon's animosity toward the Young Gunnaz, as well as his association with CAC. The government similarly offered the tattoo evidence to help establish his motive for violence against the Young Gunnaz, and to show his loyalty to Harrison and Meregildo -- indeed other members of CAC had similar tattoos. Hence, the rap video and tattoos were relevant, their probative value was not outweighed by the danger of unfair prejudice, and Colon's First Amendment rights were not implicated when the district court admitted the evidence from his social media account.

**C.** *The Stored Communications Act*

Colon submits that, as applied to him, the SCA is unconstitutional because it provides a mechanism for the government to obtain stored content, without a comparable mechanism for criminal defendants to do so. *See* 18 U.S.C. § 2703. Colon claims that the SCA prohibited him from subpoenaing Facebook for page content, thereby denying him his Fifth Amendment due process right to present evidence and his Sixth Amendment right to confront adverse witnesses.

We review a constitutional challenge to a statute *de novo*. *United States v. Pettus*, 303 F.3d 480, 483 (2d Cir. 2002). Section 2703(c)(1) of the SCA provides:

> A governmental entity may require a provider of electronic communication service or remote computing service to disclose a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications) . . . .

18 U.S.C. § 2703(c)(1). The government may obtain this information through, *inter alia*, a warrant, consent of the subscriber or customer, or through a court order in circumstances where the government offers "specific and articulable facts showing that there are reasonable grounds to believe that the contents . . . are relevant and material to an ongoing criminal investigation." *Id.* § 2703(c)(1)-

2703(d). The SCA does not, on its face, permit a defendant to obtain such content.[2]

The instant challenge stems from the government's receipt of posts from the Facebook account of Devin Parsons (the "Parsons Account"). Although Parsons was incarcerated at the time, he was relaying messages to a friend who would post them to Facebook for him, and later began to post messages himself from a contraband cell phone. In one post, Parsons stated that he was "tellin on" certain individuals from the "bx" but "not tellin on nobody from HARLEM." Appendix ("App.") 486. On September 12, 2012, before trial commenced, Colon sent a subpoena to Facebook seeking the contents of the Parsons Account. On September 20, 2012, Facebook moved to quash the subpoena on the grounds that the SCA does not allow private parties to obtain content from service providers, and that the appropriate method for obtaining such content was to subpoena a user directly. On October 4, 2012, the district court granted Facebook's motion to quash.

---

[2] The government points to other statutes and rules that similarly provide for one-sided access. For example, the search warrant provisions of Fed. R. Crim. P. 41(b) and the wiretap application provisions of 18 U.S.C. § 2516(1) both provide a means for the government to obtain evidence without a mechanism for defendants to do so.

On October 16, 2012, counsel for Colon notified the district court and the government that he had received the contents of the Parsons Account through the work of a private investigator. Colon's counsel made use of the Parsons Account at trial, cross-examining Parsons about the substance of the postings, and introducing a portion of the Parsons Account into evidence. Finally, in a letter dated February 5, 2013, Colon disputed that he had the complete Parsons Account because he "had no way of knowing whether or not the Facebook records that [he] had for Parsons were complete." App. 503-04.

We have not previously addressed the question of the constitutionality of the SCA, and we need not do so now. Colon possessed the very contents he claims the SCA prevented him from obtaining, and his suggestion that there could have been additional relevant exculpatory material in the Parsons Account is purely speculative. He has made no showing as to what else the Parsons Account might have contained, or how it might have been helpful to him. Moreover, he failed to subpoena Parsons and the individual who created the account in his name, the two direct potential sources for the contents of the account. Colon, therefore, has not shown any injury from the statute. We reject this claim.

**D.** *The Jury Instructions*

Two aspects of the district court's instructions to the jury are challenged: (1) the uncalled witness charge, and (2) the supplemental instruction regarding the narcotics conspiracy.

**1.** *The Uncalled Witness Charge*

Meregildo contends that his right to present a defense was infringed when the district court instructed the jury not to draw inferences against either party with respect to uncalled witnesses.

On the ninth day of trial, the government stated in open court but outside the presence of the jury that it planned to call cooperating witness Walter Aponte the next day as part of its case-in-chief. The next day of trial, however, again in open court but outside the presence of the jury, the government stated that it would not, in fact, be calling Aponte. Neither the government nor any of the defendants called Aponte to testify at trial.

Judge Pauley proposed to give his standard "uncalled witnesses" charge to the jury:

> You may have heard the names of certain people during the course of the trial who did not testify. I instruct you that each party had an equal opportunity, or lack of opportunity, to call any of these witnesses.

Therefore, you should not draw any inferences or reach any conclusions as to what they would have testified had they been called. Their absence should not affect your judgment in any way. I remind you that the law does not impose on a defendant the burden or duty of calling any witnesses or producing any evidence.

App. 3256. Meregildo objected, initially on the grounds that he did not have an "equal opportunity" to call Aponte. Tr. 5608-09. Judge Pauley overruled Meregildo's objection, finding that Aponte was equally available to both parties because Meregildo "could have issued a subpoena," and Aponte was detained "right across the street." *Id.*

The next day of trial, Meregildo's counsel conceded that he had an equal opportunity to call Aponte, but objected to the proposed language of the uncalled witness charge on the grounds that the jury should at least be permitted -- if not required -- to draw an adverse inference against the government based on its sudden failure to call Aponte at trial. Judge Pauley reiterated that Meregildo could make arguments regarding Aponte's absence to the jury, and in summation Meregildo's counsel did in fact argue that Aponte had been the one responsible for Ogarro's murder but that "we'll never know because a cooperating witness, Mr. Walter Aponte, was never here." Tr. 6017. Over

- 23 -

Meregildo's objections, Judge Pauley ultimately delivered the uncalled witness charge as proposed.

Meregildo contends that, instead of giving an uncalled witness charge, which permits no inferences, the district court should have given a missing witness charge, which "invites the jury to draw an adverse inference against a party that fails to call a witness whose production . . . is peculiarly within [that party's] power." *United States v. Gaskin*, 364 F.3d 438, 463 (2d Cir. 2004) (internal quotation marks omitted); *compare* 1 Leonard B. Sand, et al., Modern Federal Jury Instructions ¶ 6.04, at 6-5 (rev. 2011) ("Missing Witness Not Equally Available to Defendant"), *with id.* at 6-7 ("Uncalled Witness Equally Available"). "We review a district court's refusal to provide a requested missing witness instruction for abuse of discretion and actual prejudice." *United States v. Ebbers*, 458 F.3d 110, 124 (2d Cir. 2006); *see also United States v. Torres*, 845 F.2d 1165, 1170-71 (2d Cir. 1988) ("Whether a missing witness charge should be given lies in the sound discretion of the trial court.").

In this case, the district court did not abuse its discretion in delivering an uncalled witness instruction instead of a missing witness instruction. Meregildo conceded in the district court that he had an equal

opportunity to call Aponte, and thus he cannot now take the contrary position on appeal. The district court had "discretion to (1) give no instruction and leave the entire subject to summations, (2) instruct the jury that no unfavorable inference may be drawn against either side, or (3) instruct the jury that an adverse inference may be drawn against either or both sides." *United States v. Caccia*, 122 F.3d 136, 139 (2d Cir. 1997) (citations omitted). Given the facts of this case, Judge Pauley did not abuse his discretion in charging the jury that "no unfavorable inference may be drawn against either side." *Id.* Finally, Meregildo has not demonstrated actual prejudice. Hence, this aspect of the appeal fails.

**2.** *The Supplemental Charge*

Pierce, Colon, and Meregildo contend that the district court's supplemental jury instruction -- that membership in Count One's racketeering enterprise (CAC) was not required for the Count Fifteen narcotics conspiracy -- constructively amended the indictment or, in the alternative, resulted in a prejudicial variance.

On November 29, having begun their deliberations, the jurors sent a note to Judge Pauley that asked: "As related to [Count Fifteen], is the conspiracy limited to the Courtlandt Avenue [C]rew? Or working together or in concert

- 25 -

with the Courtlandt Avenue Crew?" Tr. 6462. The government and defense counsel agreed that the court should re-read the narcotics conspiracy charge to the jury, but the government argued that the court should also add that "[t]he charge in the indictment is not by its terms . . . limited to the Courtlandt Avenue Crew or its members or associates." Tr. 6429. Over the objection of defense counsel, the district court read the following supplemental instruction to the jury:

> Members of the jury, [Count Fifteen] of the indictment does not allege that membership in the narcotics conspiracy requires membership in the Courtlandt Avenue Crew. To show that a conspiracy existed, the evidence must show that two or more persons, in some way or manner, either explicitly or implicitly, came to an understanding to violate the law and to accomplish an unlawful plan . . . . Finally, members of the jury, I remind you of my instruction . . . that the indictment defines the charged racketeering enterprise as the Courtlandt Avenue Crew, which is simply a form of reference adopted for the purposes of the indictment to describe the group of individuals who participated in the alleged racketeering enterprise.

Tr. 6462-63.

#### a. *Constructive Amendment*

Pierce, Colon, and Meregildo contend that as charged in the indictment, participation in the Count Fifteen narcotics conspiracy required membership in CAC, and that when the court issued a supplemental instruction

- 26 -

that CAC membership was not required for Count Fifteen, the narcotics conspiracy charge was constructively amended in violation of the Grand Jury Clause. Defendants renew their argument that they were on notice to defend against only the charge of a narcotics conspiracy involving CAC, not that they "had to defend against a general conspiracy to sell drugs in the Bronx." App. 3478.

We review claims of constructive amendment *de novo*. *United States v. McCourty*, 562 F.3d 458, 469 (2d Cir. 2009). We have held that a defendant raising a claim of constructive amendment must show that "the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify *essential elements* of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." *United States v. Vilar*, 729 F.3d 62, 81 (2d Cir. 2013) (internal quotation marks omitted) (emphasis in original). We have not found constructive amendment in a case "where a generally framed indictment encompasses the specific legal theory or evidence used at trial." *United States v. Milstein*, 401 F.3d 53, 65 (2d Cir. 2005) (per curiam) (internal quotation marks omitted).

By the plain language of the indictment, membership in CAC was not required for Count Fifteen, the narcotics conspiracy count. Count Fifteen does not explicitly mention CAC (i.e., the racketeering enterprise charged in Count One), nor does it assert that the goals of the narcotics conspiracy were coextensive with the goals of CAC. In fact, two defendants who were not charged with being members of CAC in Count One were charged with being members of the Count Fifteen narcotics conspiracy. Nothing in the indictment suggested that membership in CAC was a necessary prerequisite to membership in the narcotics conspiracy. The general nature of the narcotics conspiracy charge put appellants on notice of the "core of criminality" charged in Count Fifteen, and the district court's supplemental instruction did not modify any "essential element" of the offense. *See United States v. D'Amelio*, 683 F.3d 412, 416-18 (2d Cir. 2012). We conclude that there was no constructive amendment of the indictment.

### b. *Prejudicial Variance*

Defendants argue in the alternative that even if the supplemental instruction did not constructively amend the indictment, it constituted a prejudicial variance because it broadened the scope of the conspiracy such that

- 28 -

the jury could convict the defendants in the absence of a common purpose. Colon contends that, rather than a common scheme or purpose, the proof showed an "undisciplined group of teenage crack peddlers [who] were concerned principally with advancing their own individual economic interests. To that end, especially after Harrison's murder, they formed innumerable temporary alliances, connections and confederations."  Colon Br. 58.

"A variance occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment."  *United States v. Salmonese*, 352 F.3d 608, 621 (2d Cir. 2003) (internal quotation marks omitted).  Although both constructive amendment and variance are based on constitutional concerns, constructive amendment is a *per se* violation of the Grand Jury Clause, *see id.*, while a defendant must show "substantial prejudice" to warrant reversal on a variance claim, *United States v. Rigas*, 490 F.3d 208, 226 (2d Cir. 2007) (internal quotation marks omitted).  "Because proof at trial need not, indeed cannot, be a precise replica of the charges contained in an indictment, this court has consistently permitted significant flexibility in proof, provided that the defendant was given notice of the core of criminality to be proven at trial."

- 29 -

*United States v. Heimann*, 705 F.2d 662, 666 (2d Cir. 1983) (internal quotation marks omitted).

In conspiracy cases, we have held that "[w]hen convictions have been obtained on the theory that all defendants were members of a single conspiracy although, in fact, the proof disclosed multiple conspiracies, the error of variance has been committed." *United States v. Bertolotti*, 529 F.2d 149, 154 (2d Cir. 1975). In *Bertolotti*, we acknowledged:

> This Circuit has gone quite far in finding single conspiracies in narcotics cases. Despite the existence of multiple groups within an alleged conspiracy, we have considered them as part of one integrated loose-knit combination in instances where there existed 'mutual dependence and assistance' among the spheres, a common aim or purpose among the participants, or a permissible inference, from the nature and scope of the operation, that each actor was aware of his part in a larger organization where others performed similar roles equally important to the success of the venture.

*Id.* (citations omitted). In *Bertolotti* we reversed the conviction because ultimately we found "no evidence linking [the defendants' transactions] together in a single overall conspiracy." *Id.* at 155.

Here, we are satisfied that there was sufficient evidence for a jury to find that the charged distribution took place and that defendants' activities were

part of the narcotics conspiracy charged in Count Fifteen. Cooperating witnesses testified, *inter alia*, that Pierce sold drugs with other GFC members; and Parsons testified that he was instructed by Harrison that if Harrison was not available to receive the proceeds of narcotics sales, Parsons should deliver those proceeds to Pierce. This evidence, along with the evidence of the roles of Meregildo and Colon described above in Parts A.1 and A.2 of the Discussion Section, established the requisite "mutual dependence and assistance" necessary for "one integrated loose-knit" conspiracy. *Id.* at 154 (internal quotation marks omitted).

E.    *Pierce's Sentence*

Pierce argues that the district court erred by imposing a 35-year sentence for his two Section 924(c) gun convictions (Counts Twenty-Four and Twenty-Eight) because the district court sequenced the convictions in a way that is inconsistent with the rule of lenity. This is an issue of first impression in the Second Circuit.

Under 18 U.S.C. § 924(c)(1)(A), for a first conviction, a defendant receives a mandatory minimum consecutive sentence of five years if the firearm is used or carried during the crime, and ten years if the firearm is discharged during the crime. In the event of a "second or subsequent conviction . . . the

person shall . . . be sentenced to a term of imprisonment of not less than 25 years."  18 U.S.C. § 924(c)(1)(C).

In *Deal v. United States*, the Supreme Court clarified that a "second or subsequent conviction" can arise when a defendant is charged with multiple violations of Section 924(c) in the same indictment or arising from the same proceedings.  508 U.S. 129, 135-37 (1993).  One of the convictions is treated as the first conviction and the others are treated as "second or subsequent."  But the Supreme Court did not explain how to order those convictions for sentencing purposes, nor does the text of the statute provide guidance.  Accordingly, we adopt the analysis of the Sixth Circuit's recent decision in *United States v. Washington*, which we find persuasive.  714 F.3d 962, 971 (6th Cir. 2013) ("Because we conclude that § 924(c)(1)(C) is ambiguous as to how convictions should be ordered for sentencing when a defendant is convicted on multiple counts of carjacking that arise from the same indictment and proceedings, we are bound by [the principle of lenity]."); *see also United States v. Major*, 676 F.3d 803, 815 (9th Cir. 2012).

Here, the district court treated the discharge conviction as the first Section 924(c) conviction (carrying 10 years), and the possession conviction as the

second conviction (carrying 25 years), totaling a mandatory minimum of 35 years. On appeal, Pierce suggests -- and the government concedes -- that because the statute is silent on how the counts should be sequenced for sentencing purposes, the rule of lenity applies. *See Rewis v. United States*, 401 U.S. 808, 812 (1971) ("[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity."). We agree. The district court should have treated the possession conviction as the first Section 924(c) conviction (carrying 5 years), and the discharge conviction as the second conviction (carrying 25 years), totaling an aggregate statutory minimum of 30 years rather than 35 years for the Section 924(c) convictions. Accordingly, we remand with instructions for the district court to vacate the sentences on the two counts and resentence Pierce accordingly.

## CONCLUSION

For the foregoing reasons, the judgments of the district court are **AFFIRMED**, except that the case is **REMANDED** as to Pierce, with instructions for the district court to vacate and resentence on Counts Twenty-Four and Twenty-Eight as set forth above.