People v Reaves (2025 NY Slip Op 05107)

People v Reaves

2025 NY Slip Op 05107

Decided on September 24, 2025

Appellate Division, Second Department

Warhit, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on September 24, 2025
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

LARA J. GENOVESI, J.P.
BARRY E. WARHIT
HELEN VOUTSINAS
PHILLIP HOM, JJ.

2019-07983
 (Ind. No. 9354/16)

[*1]The People of the State of New York, respondent,
v
Idrissa Reaves, appellant.

APPEAL by the defendant from a judgment of the Supreme Court (Vincent Del Giudice, J.), rendered June 13, 2019, and entered in Kings County, convicting him of criminal facilitation in the second degree, upon a jury verdict, and imposing sentence.

Patricia Pazner, New York, NY (David Fitzmaurice and Jenner & Block LLP [Adina Hemley-Bronstein, Benjamin Alter, and Anthony S. Barkow], of counsel), for appellant.
Eric Gonzalez, District Attorney, Brooklyn, NY (Leonard Joblove, Keith Dolan, and Keerthana Nunna of counsel), for respondent.

WARHIT, J.

OPINION & ORDER
On this appeal, we are asked to determine whether the Supreme Court erred in admitting into evidence a rap song, which the defendant had performed over a recorded telephone call during his pretrial incarceration, through the testimony of an investigator employed by the Kings County District Attorney's Office whom the court qualified as an expert in slang. For the reasons that follow, we conclude that, under the facts and circumstances of this case, the investigator was unqualified to offer expert opinion testimony regarding the meaning of the rap lyrics. Additionally, while the investigator's initial interpretations of the lyrics were often varied and reflected the lyrics' inherent ambiguity, the investigator's ultimate proffered opinions precisely and remarkably mirrored the People's exact factual theory of the case. Moreover, the investigator's interpretations of the lyrics also implied that the defendant had committed prior bad acts and crimes that were not charged in the indictment. Accordingly, we find that the defendant was deprived of a fair trial by the admission of this evidence, and, therefore, the judgment convicting the defendant of criminal facilitation in the second degree must be reversed and a new trial ordered.
Factual and Procedural Background
The defendant was charged with, among other crimes, murder in the second degree under an acting in concert theory (Penal Law § 125.25[1]) and criminal facilitation in the second degree (id. § 115.05), an element of which is that the defendant believed it probable that he was rendering aid to a person who intended to commit a class A felony, in this case murder (see id.)[FN1]. [*2]The charges stemmed from the shooting death of Nashon Henry, which occurred on August 29, 2016, in Brooklyn. According to the People's evidence, the shooter opened fire into the victim's van, while another individual, the driver of a gray Nissan, made a U-turn, stopped, opened the passenger door, and waited for the shooter to get into the vehicle before driving away together. Authorities later discovered that on the day in question, the gray Nissan was being operated by the defendant and that prior to the shooting, the defendant's vehicle had followed the victim through various neighborhoods in Brooklyn. The shooter was never identified or apprehended.
Pretrial Hearing
While the defendant was incarcerated at Rikers Island and awaiting trial, he, with the assistance of another person, authored a rap song, which the defendant performed over recorded telephone calls. The People sought to admit the recorded telephone calls, including the rap song, into evidence at trial. After playing the rap song for the Supreme Court prior to the start of the defendant's trial, the prosecutor argued that it was admissible as an "admission" and a "statement of prior knowledge." The court ruled, over the defendant's objection, that the rap song was admissible, provided the People were able to present someone who was qualified in slang to interpret the lyrics, since there were terms used that were "not within the ken of your average juror."
The following morning, the prosecutor informed the Supreme Court that the People had no expert witness available to put on the stand, and the court stated that the People would be given "ten minutes" to "get somebody" to be their expert. The People then produced as their proposed expert Detective Investigator Kolawole Olosunde (hereinafter the investigator), who worked in the Special Investigations Unit at the Kings County District Attorney's Office. The investigator, who had never previously been qualified as an expert in "street lingo," primarily described his duties and responsibilities in his current assignment, which included participating in debriefings and "self-driven investigations of criminal street gangs, as well as other drivers of violent crime." As part of those investigations, he interviewed suspects and witnesses and listened to recorded telephone conversations from Rikers Island. The investigator testified that he had listened to certain of the Rikers Island calls from this case and that he was familiar with "some" of the vernacular or terms used in those calls. He testified that he took the same approach in trying to decipher slang from a regular conversation as he did "when listening to an artistic expression such as a rap song."
Following the investigator's testimony, defense counsel objected to qualifying the investigator as an expert, arguing, among other things, that he lacked the requisite experience. Additionally, defense counsel noted, inter alia, that the instant case involved "an artistic expression," not just a conversation. In this regard, counsel asserted that one "writing a poem or a rap song" has "to fill the lines, or make something rhyme," and "[q]uite often there's extraneous language." Counsel contended that the defendant would be unduly prejudiced by qualifying the investigator as an expert because the jury would "accept his version of how he interprets this . . . rap song" without anything to support the accuracy of such interpretation.
At the conclusion of the hearing, the Supreme Court qualified the investigator as an expert in the field of slang.
The Trial
As relevant to this appeal, the People presented evidence at trial that the shooter fled the scene in the gray Nissan, which was being driven by the defendant. The People's evidence also included cell site records and surveillance footage, which demonstrated that prior to the shooting, the defendant drove behind the victim's van for approximately 40 minutes before both vehicles came to a stop at the same red light, where the victim was fatally shot.
The People also introduced the testimony of the investigator, who testified as an expert in "slang." The People played the entire rap song for the jury and asked the investigator to provide a line-by-line interpretation of what he thought the lyrics meant.
In relevant part, the prosecutor asked the investigator to interpret the following lyrics: "Boy always fu**ed up but he wanna drill a n****." The investigator initially provided a myriad of interpretations of these words, explaining that the verse "[b]oy always fu**ed up" could mean "you're poor, don't have money, or fu**ed up as in high or otherwise inebriated, or something that makes you impaired." He continued that the verse "but he wanna drill a n****" "contextually" [*3]read—in perfect accord with the People's theory of the case—as "someone who might be impaired but wants to be involved in a shooting."
The prosecutor turned to the following lyrics: "No food, no bud so I swipe for a n****[.] Life for a n****[.] Talk about the bag getting hyped with a n****." Although there was no allegation in the indictment regarding the illegal use or possession of credit cards, the prosecutor elicited from the investigator that "swipe" meant "the use of fraudulent or otherwise illicitly gained credit cards or EBT cards, or any number of methods of swiping or gaining money or food items for someone." The investigator also testified that "the bag is getting money or getting rich, or enriched."
The prosecutor then turned to the following lyrics: "I said, look, I said boy circle fu**ed up so I'm seein' him alone[.] They . . . wasn't really jackin' him so he ply him with the chrome." The investigator opined that the phrase "boy circle fu**ed up" referred to the "person or people he surrounds himself with are somehow impaired," adding that he "guess[ed]" it meant "they're not . . . cohesive or good people." The investigator first acknowledged that the term "jacking" had a variety of different meanings but then asserted that "[c]ontextually here" it meant "they wasn't . . . promoting him, or representing him, or embracing him into their circle." The investigator testified that the verse "so he ply him with the chrome" meant to "[s]upply him with . . . a firearm." Notably, and once again in complete accord with the People's theory of accomplice liability, the investigator opined that the previous verse coupled with another verse, "the drill a," referenced "using that firearm in the commission of a shooting or homicide or serious assault."
The prosecutor also addressed the following lyrics: "I said heard about your come up n****s drove him to the bump[.] That wasn't your drill that was another n****'s target." The investigator explained that "heard about your come up" might indicate a "promotion, gaining money, or somehow or another betterment of your prior circumstances" and that "bump" meant "a location where something is going to take place," such as "a home" or a "street." Additionally, and in perfect symmetry with the People's factual theory of the case, the investigator testified that this "wasn't your drill" meant "you weren't supposed to be the one that did that shooting" and that "n****'s target" meant "another person's target." He then stated that, in the context of the surrounding lyrics, "come up" might be in reference to "a contract or a paid shooting or a homicide or assault." Significantly, a contract or paid killing is an element of murder in the first degree, which was not charged in the indictment. Despite the reference to a contract killing being evidence of an uncharged crime, the People continued to elicit similar testimony by asking the investigator to define the verse "[t]akin' slugs for a pretty penny," which the investigator interpreted to mean that "the contract was not particularly lucrative." The investigator also testified that the verse "I said no bread so I took you to the ling" contextually might mean "the place where you get money, ATM, bank, or house, [or] any number of things . . . , it can be check cashing place or the place where somebody is going to pay you."
The prosecutor then asked the investigator to interpret the following: "But fake love 'cause your OP n****s knew them brothers[ ] . . . . Chris Paul no chuck I knew them brothers first." The investigator testified that Chris Paul was a National Basketball Association point guard "known for passing the ball," meaning "giving an assist." The investigator opined that the Chris Paul reference, used in conjunction with other phrases, indicated the author took pride in providing assistance "generating that introduction between the subject of this rap poem, and the person to whom they were introduced, the brothers, [he] knew them first."
The investigator acknowledged during cross-examination that deciphering rap lyrics was different from interpreting regular conversations because rap lyrics incorporated "similes and metaphors." The investigator further acknowledged that rap lyrics were not always literal and could have "double meanings." The investigator also conceded that nothing in the rap lyrics were suggestive of a timeline. Lastly, the investigator acknowledged that, during a recorded conversation, the defendant stated, "[m]y son gave me a few, like 3 bars," which indicated that the defendant was not the sole author of the rap song. The investigator opined that this statement suggested "someone else gave [the defendant] three lines or three elements of the rap poem" but that there was "no indication as to which specific lines those might be."
At the close of the People's case, defense counsel moved to dismiss the charges, arguing that the People failed to set forth any evidence proving that the defendant knew the shooter had a gun or intended to kill somebody. In response, the People argued, inter alia, that the defendant's conduct prior to the shooting coupled with the rap song clearly demonstrated that the defendant knew that the shooter intended to kill someone. The Supreme Court denied the [*4]defendant's motion.
Following the trial, the jury found the defendant not guilty of murder in the second degree but found him guilty of criminal facilitation in the second degree. The defendant appeals.
Legal Discussion
On appeal, the defendant contends, among other things, that the evidence was legally insufficient to support his conviction and that he was deprived of a fair trial by the admission of the rap song through an unqualified expert.
Initially, contrary to the defendant's contention, viewing the evidence in the light most favorable to the prosecution (see People v Contes, 60 NY2d 620, 621), we find that it was legally sufficient to establish his guilt beyond a reasonable doubt. Moreover, in fulfilling our responsibility to conduct an independent review of the weight of the evidence (see CPL 470.15[5]; People v Danielson, 9 NY3d 342, 348), we nevertheless accord great deference to the jury's opportunity to view the witnesses, hear the testimony, and observe demeanor (see People v Mateo, 2 NY3d 383, 410; People v Bleakley, 69 NY2d 490, 495). Upon reviewing the record here, we are satisfied that the verdict of guilt was not against the weight of the evidence (see People v Romero, 7 NY3d 633).
However, we find that the defendant was deprived of a fair trial based upon the improper admission of the rap song through a witness who was unqualified to offer expert opinion testimony regarding the meaning of the lyrics, and whose interpretations were often grounded in admitted speculation, but which ultimately evolved into opinions fitting precisely into the People's factual theory of the case. Although the defendant's challenge to the improper admission of this evidence is partially unpreserved for appellate review (see CPL 470.05[2]), we nevertheless review the issue in the exercise of our interest of justice jurisdiction (see id. § 470.15[6][a]).
A number of courts have recognized that rap music is a form of artistic expression that often contains nonliteral references to criminality and illicit conduct. Accordingly, courts have cautioned against the improper admission of such evidence (see e.g. United States v Jordan, 714 F Supp 3d 158, 163 [ED NY] ["it may not be surprising that nearly every rap album in the Billboard Top 200 today contains references to drug use, drug sales, violence, or some combination of the three," and thus, "one cannot necessarily infer criminality simply from a rapper's reference to violence, drug dealing, and the like"]; United States v Wiley, 610 F Supp 3d 440, 445 [D Conn] ["some courts have expressed concern that the fundamental nature of rap music as a form of artistic expression that frequently features aggressive and hyperbolic language would pose too great a risk of undue prejudice"]; United States v Williams, 2017 WL 4310712, *7, 2017 US Dist LEXIS 160102, *18 [ND Cal, No. 3:13-cr-00764-WHO-1] [noting that rap songs "are a form of artistic expression, and as with any artistic expression, it is difficult to distinguish between reality and fantasy"]; State v Skinner, 218 NJ 496, 524, 95 A3d 236, 253 ["extreme caution must be exercised when expressive work is involved, particularly when such expression involves social commentary, exaggeration, and fictional accounts"]).
However, both state and federal courts have held that, under the appropriate circumstances, rap lyrics may be admitted into evidence at a criminal trial [FN2]. For instance, rap lyrics have been admitted where they were relevant to the issue of a defendant's knowledge and intent (see People v Green, 92 AD3d 953, 956; United States v Foster, 939 F2d 445, 455-456 [7th Cir]) or as evidence of the defendant's consciousness of guilt (see People v Green, 92 AD3d at 956; People v [*5]Wallace, 59 AD3d 1069, 1070; see also People v Goldman, 35 NY3d 582, 595).[FN3]
Rap lyrics have also been the subject of expert testimony at criminal trials (see e.g. People v Green, 92 AD3d at 954, 956; Mendoza v Cates, 2024 WL 5213097, *13-14, 2024 US Dist LEXIS 232085, *39-40 [ND Cal, No. 22-cv-04094-AMO (PR)]). In general, expert opinion testimony is appropriate "when it would help to clarify an issue calling for professional or technical knowledge, possessed by the expert and beyond the ken of the typical juror" (People v Taylor, 75 NY2d 277, 288 [internal quotation marks omitted]; see People v Hill, 85 NY2d 256, 261). The meaning of coded communications is a proper subject of expert testimony (see People v Inoa, 25 NY3d 466, 473). Law enforcement officials have been qualified as experts to testify concerning the meaning of "street slang" used in recorded conversations (People v Barksdale, 129 AD3d 1497, 1498 [internal quotation marks omitted]; see People v Williams, 146 AD3d 410, 410), as well as coded communications used by narcotics traffickers (see People v Artis, 63 AD3d 1173; People v Contreras, 28 AD3d 392, 392-393), gangs (see People v Washington, 217 AD3d 532, 533; People v Goldman, 189 AD3d 698, 699), and "'pimps and prostitutes'" (People v Trantham, 225 AD3d 714, 716, quoting United States v Pruitt, 839 Fed Appx 90, 93 [9th Cir]). "The admissibility of expert testimony is generally addressed to the discretion of the trial court" (People v Fields, 212 AD3d 648, 650; see People v Lee, 96 NY2d 157, 162).
However, to be qualified to offer expert opinion testimony, the witness must possess "the requisite skill, training, education, knowledge or experience from which it can be assumed that the information imparted or the opinion rendered is reliable" (Matott v Ward, 48 NY2d 455, 459; see People v Menendez, 50 AD3d 1061, 1062). "The expert's opinion, taken as a whole, must also reflect an acceptable level of certainty in order to be admissible" (Ghazala v Shore Haven Apt. Del, LLC, 229 AD3d 447, 448 [internal quotation marks omitted]; see Matott v Ward, 48 NY2d at 460; People v Allweiss, 48 NY2d 40, 50).
Under the circumstances of this case, we find that the People failed to establish that their proffered expert witness was qualified to render an expert opinion as to the meaning of the rap lyrics. After the Supreme Court gave the People "ten minutes" to "get somebody," the People proffered the investigator as their expert. Although the investigator testified that he had attended trainings regarding gangs, including "gang lingo," this case did not involve gangs [FN4]. Additionally, [*6]the investigator acknowledged that rap lyrics are not always literal and cannot be interpreted like a regular conversation. The investigator's testimony regarding his exposure and/or familiarity with rap music from watching YouTube videos and "music videos posted by alleged gang members, and their ilk," which he stated could largely be understood using "common sense," was insufficient to demonstrate that he possessed the requisite skill, training, knowledge, and/or experience necessary to render a reliable opinion regarding the meaning of the rap lyrics at issue in this case (see People v Burt, 270 AD2d 516, 517-518; People v Barrett, 189 AD2d 879, 881; cf. People v Green, 92 AD3d at 956).[FN5]
Moreover, the investigator gave a variety of interpretations for the same lyrics and even admitted to guessing as to some of his interpretations, but he then consistently offered opinions that invariably inculpated the defendant in the precise way the People argued the defendant participated in the charged crimes (cf. People v Williams, 146 AD3d at 410). Crucially, these interpretations bolstered the People's theory of accomplice liability, that is, that the defendant had prior knowledge of the shooter's intentions and even supplied the gun. Separately, the investigator also indicated that the defendant was not the sole author of the rap song and that the investigator could not determine which portions had been written by someone else.
The admission of the investigator's testimony concerning his interpretation of the rap song was the People's only direct evidence of the defendant's mental state prior to the shooting. Without the investigator's testimony, the People failed to establish the relevancy of the rap lyrics to the circumstances of this case (cf. People v Powell, 115 AD3d 1253, 1255; People v Green, 92 AD3d at 956)[FN6]. Indeed, the rap song was replete with language that was beyond the ken of the average juror and, according to the investigator, was open to a variety of interpretations.
Further, the error in admitting the investigator's testimony concerning his interpretation of the lyrics was exacerbated by the fact that his testimony also described prior bad acts and uncharged crimes. This testimony was offered in the absence of the Supreme Court applying the required Molineux balancing test (see People v Molineux, 168 NY 264) regarding the admission of such testimony (see People v Leonard, 29 NY3d 1, 7). Multiple uncharged crimes were attributed to the defendant. For example, the investigator testified that the lyrics "so I swipe for a n****" meant, in pertinent part, "the use of fraudulent or otherwise illicitly gained credit cards or EBT cards." There was no charge in this case relating to the illegal use or possession of credit cards, and this testimony was entirely irrelevant to the issue of whether the defendant knew the shooter intended to kill the victim.
Additionally, the investigator testified that the lyrics "[t]hat wasn't your drill[,] that was another n****'s target" suggested "a hired hit." The investigator also testified with respect to the preceding lyrics "heard about your come up," that "come up" could mean "money within that [*7]context, i.e., a contract or a paid shooting or a homicide or assault." The defendant was charged with murder in the second degree, and this testimony improperly suggested the defendant was guilty of murder in the first degree by having been involved in a murder-for-hire (see Penal Law § 125.27[1][a][vi]).
The prosecutor compounded this error during summation by repeatedly referring to the circumstances of the crime as a paid hit—an uncharged and inflammatory allegation—based on the investigator's interpretation of the rap lyrics. The prosecutor argued, among other things, that "this was a hit," "[o]ne can infer [the defendant] would be getting paid for it," "the defendant gets paid for helping [the shooter] carry out that hit," and "[e]verything in the defendant's rap song that was another person's target, this was a hit." The prosecutor repeatedly referred to the shooting as a "hit," making this reference 12 times during summation.
Accordingly, for all these reasons, the Supreme Court erred in admitting the rap song into evidence through the testimony of the investigator.
Therefore, the judgment must be reversed and the matter remitted to the Supreme Court, Kings County, for a new trial on the count of criminal facilitation in the second degree.
In light of our determination, we need not reach the defendant's remaining contentions.
Accordingly, the judgment is reversed, on the law and as a matter of discretion in the interest of justice, and the matter is remitted to the Supreme Court, Kings County, for a new trial on count four of the indictment, charging the defendant with criminal facilitation in the second degree.
GENOVESI, J.P., VOUTSINAS and HOM, JJ., concur.
ORDERED that the judgment is reversed, on the law and as a matter of discretion in the interest of justice, and the matter is remitted to the Supreme Court, Kings County, for a new trial on count four of the indictment, charging the defendant with criminal facilitation in the second degree.
ENTER:
Darrell M. Joseph
Clerk of the Court

Footnotes

Footnote 1: "A person is guilty of criminal facilitation in the second degree when, believing it probable that he [or she] is rendering aid to a person who intends to commit a class A felony, he [or she] engages in conduct which provides such person with means or opportunity for the commission thereof and which in fact aids such person to commit such class A felony" (Penal Law § 115.05).

Footnote 2: The United States Court of Appeals for the Second Circuit has held that rap lyrics are properly admitted "where they are relevant and their probative value is not substantially outweighed by the danger of unfair prejudice" (United States v Pierce, 785 F3d 832, 841 [2d Cir]; see United States v Herron, 762 Fed Appx 25, 30 [2d Cir]). In United States v Jordan (714 F Supp 3d at 164), the United States District Court for the Eastern District of New York, relying upon federal court precedent, concluded that "a rule-of-thumb has emerged from court decisions that have considered this issue—the relevance of rap lyrics as trial evidence depends on the existence of a specific factual nexus between the content of rap music and the crimes alleged" (see United States v Carpenter, 2022 WL 16960577, *3, 2022 US App LEXIS 31605, *8 [2d Cir, No. 21-837-cr] [holding that rap lyrics and rap music videos were admissible since they spoke "with specificity to the precise conduct with which [the defendant] was charged"]).

Footnote 3: The defendant notes that New York has proposed legislation to amend the rules of evidence to limit the admissibility of a defendant's creative or artistic expression in a criminal proceeding (see 2023 NY Senate Bill S1738, 2023 NY Assembly Bill A127). The proposed legislation would require the People to overcome a presumption of inadmissibility of evidence of a defendant's creative expression by proving through clear and convincing evidence:
"(a) literal, rather than figurative or fictional, meaning and, where the work is derivative, that the defendant intended to adopt the literal meaning of the work as the defendant's own thought or statement; (b) a strong factual nexus indicating that the creative expression refers to the specific facts of the crime alleged; (c) relevance to an issue of fact that is disputed; and (d) distinct probative value not provided by other admissible evidence" (2025 NY Senate Bill S464, 2025 NY Assembly Bill A123; see Brad Hoylman-Sigal, Senators Brad Hoylman & Jamaal Bailey Introduce "Rap Music on Trial" Legislation to Prevent Song Lyrics From Being Used As Evidence In Criminal Cases [Nov. 17, 2021], available at https://www.nysenate.gov/newsroom/press-releases/2021/brad-hoylman-sigal/senators-brad-hoylman-jamaal-bailey-introduce-rap [last accessed Sept. 5, 2025]).

Footnote 4: Moreover, even if the investigator were properly qualified to provide expert opinion testimony on gangs, it does not necessarily follow that he would be qualified to provide expert witness testimony on rap lyrics (see United States v Williams, 663 F Supp 3d 1085, 1141 [D Ariz] [noting that a Bureau of Alcohol, Tobacco, Firearms and Explosives special agent who had investigated a gang in which the defendant allegedly was involved, but had no training or prior experience in interpreting rap lyrics, was "clearly not an expert in interpreting rap lyrics"]; Commonwealth v Gray, 463 Mass 731, 755, 978 NE2d 543, 561 [noting that "[a] police officer who has been qualified as a 'gang expert' cannot, without more, be deemed an expert qualified to interpret the meaning of rap music lyrics"]; cf. People v Wright, 2004 WL 516250, *5, 2004 Cal App Unpub LEXIS 2430, *15 [Cal Ct App, No. B162219] [holding, in a gang-related case, that "expert gang testimony" regarding the meaning of the defendant's rap lyrics was properly admitted]).

Footnote 5: In People v Green (92 AD3d at 956), this Court held, inter alia, that testimony from law enforcement witnesses concerning their understanding of certain written rap lyrics was properly admitted "over any objection based on prejudice" where "[t]he lyrics themselves were relevant to the issue of the defendant's consciousness of guilt, and both the lyrics and the testimony of the law enforcement witnesses concerning their understanding of the meaning of those lyrics were relevant to defendant's knowledge and intent" (citation omitted). The decision in Green did not address whether the law enforcement witnesses lacked the requisite qualifications to offer opinion testimony regarding their understanding of the meaning of the lyrics.

Footnote 6: The rap song, as interpreted by the investigator, also referred to gang affiliation, and there was no evidence that this case involved gangs (see People v Hollman, 98 AD3d 584, 585; cf. People v Guevara, 96 AD3d 781). For example, the investigator interpreted the lyrics "gang was his brother" to mean "the person to whom he was being introduced appears to be in a gang or in a crew."