# IN THE SUPREME COURT OF IOWA

No. 22–0397

Submitted February 20, 2024—Filed March 22, 2024

**STATE OF IOWA,**

Appellee,

vs.

**LAWRENCE GEORGE CANADY, III,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Woodbury County, Patrick H. Tott, Chief Judge.

The State seeks further review of a court of appeals decision reversing the defendant's criminal convictions and remanding for a new trial based on errors in the admission of evidence. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

Mansfield, J., delivered the opinion of the court, in which all justices joined.

Martha J. Lucey, State Appellate Defender, and Bradley M. Bender (argued), Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Louis S. Sloven (argued), Assistant Attorney General, for appellee.

Bridget E. Lavender and Emerson Sykes, New York, New York, for amicus curiae American Civil Liberties Union Foundation.

Rita Bettis Austen, Des Moines, for amicus curiae ACLU of Iowa Foundation Inc.

**MANSFIELD, Justice.**

### I. Introduction.

A fatal nighttime shooting captured on video sets the stage for this case. The defendant wasn't the shooter, but he was beating the decedent with his fists while another person delivered two fatal shots at close range. The defendant was convicted of voluntary manslaughter as an aider and abettor, willful injury causing bodily injury as a principal, and assault causing bodily injury. He now appeals.

On appeal, the defendant argues that the district court committed several errors, including when it admitted a brief cell phone video recorded on the other individual's phone about four days before the fatal shooting. The video shows the defendant and the other person doing a rap song voiceover with a recorded song in the background. At one point, the defendant and the other person sing the lyrics, "Respect . . . you gotta earn," followed by two names, one of which appears to be the same as the decedent's nickname, followed by the words, "They got hit."

The court of appeals concluded that the district court erred in admitting this video as well as a Snapchat photo. It reversed and remanded for a new trial. On further review, we conclude that the district court did not abuse its discretion in admitting this evidence, and that the defendant's other assignments of error are also without merit. Therefore, we vacate the court of appeals decision and affirm the defendant's convictions and sentence.

### II. Background Facts and Proceedings.

Martez Harrison and Lawrence Canady had been friends for three or four years. The pair had a history of physical altercations, but they had always made up and never used weapons against each other. Harrison went by the nickname "Tez" or "Tezzo."

On the night of April 30–May 1, 2021, around 10:00 p.m., Harrison came to Uncle Dave's Bar in Sioux City for a party. His fiancée, Jessica Goodman, dropped him off and planned to pick him up when the bar closed around 2:00 a.m. Those plans changed when a commotion broke out in front of the bar after midnight.

A group of four young people, led by Canady, were trying to enter the bar through its only entrance (in front). Two of the three others were male friends of Canady, Dwight Evans and J.H, and the third, N.R., was Canady's girlfriend.[1] The bar's bouncer was not allowing any of them inside.

Amanda Anderson, the bartender that evening at Uncle Dave's, went out to assist. Canady was very angry and yelling. He wanted to come into the bar to "beat somebody up" who had "bashed his sister over the head with a beer bottle." Canady also said he had a gun. When Canady spotted Harrison inside the bar, he called to him: "I'm going to see you out here. I'm waiting for you."

After leaving Canady's group waiting in front, Anderson reentered the bar and spoke to Harrison. She told him that Canady claimed to have a gun, and she urged Harrison not to go outside. Harrison said he would get a ride. Harrison called Goodman and asked her to pick him up early because "L and them" were "outside trying to jump him." Goodman knew that "L" was Canady's nickname.

Goodman arrived and parked outside the front door of the bar. As she got out of the car, Canady's group surrounded her. Canady told Goodman "to go get [her] baby daddy out of the bar." Canady commented that Harrison "should never slap Mariah with a bottle." Meanwhile, Canady leaned to Evans, touched him on the chest, and told him to "go ahead and get that." Goodman heard Canady's statement to Evans and responded, "[S]o we're gun playing now? That's what

---

[1]According to Goodman, Canady and Evans considered each other best friends.

we're really doing? We're playing with guns?" Evans walked a short distance from the group and stood by some garbage cans.

Harrison, having now realized what was happening outside, emerged from the bar. Canady attempted to land a blow on Harrison but missed and struck Goodman in the face. N.R. sprayed mace at Goodman. Canady and Harrison and N.R. and Goodman began fighting. These events were captured on a nearby surveillance camera.

Canady moved to the middle of the street and Harrison moved with him. After Canady had knocked Harrison flat on the ground and was still punching him, Evans approached both men from behind and shot Harrison twice at close range in the abdomen. Canady remained on top of Harrison after the first shot and continued to punch him in the face. Even after the second shot, Canady continued to assault Harrison, hitting him and kicking him in the face repeatedly. Canady, Evans, J.H., and N.R. then fled the scene. Harrison was immediately taken to the hospital where he died from his gunshot wounds.

Police stopped a white vehicle that had been reported leaving the scene and found Canady, J.H., and N.R. in it. Canady denied he was involved and tried to throw the officers off track by telling them they needed to be looking for a Chrysler 300 rather than the Chevrolet Aveo they had stopped.

Evans, on foot, sought help from a group of local residents, telling them that he was looking for his wallet and cell phone. One of them discovered a revolver nearby and called the police. That revolver turned out to be the weapon that had been used to kill Harrison. Evans was arrested about a block from where the gun had been found.

On July 1, Canady was charged by trial information with murder in the first degree, in violation of Iowa Code sections 707.2(1)(*a*), 703.1, and 703.2 (2021); willful injury causing bodily injury, in violation of Iowa Code section

708.4(1), 703.1, and 703.2; and assault causing bodily injury, in violation of Iowa Code section 708.2(2).[2]

The case proceeded to a jury trial. The State's theory was that Canady decided to take revenge on Harrison after learning on April 30 that Harrison had supposedly hit the girlfriend of Austin Rockwood in the face with a bottle. Rockwood and Canady were close friends. Over Canady's objection, the State entered into evidence a recording of an April 30 phone call between Rockwood and Canady. Rockwood made the call while detained at the Woodbury County Jail. During the call, Rockwood informed Canady that "Tezzo" had hit Rockwood's girlfriend Mariah with a bottle. Canady responded that he would put Harrison "on his fucking neck" and pick him up "and slam him dead on his fucking head." The pair then verbally agreed that it was "tax time."

Also over Canady's objection, the State offered into evidence a thirty-second cell phone rap video, recorded on April 26 and extracted from Evans's cell phone, to show that Canady may have had an intent to harm Harrison even before the jail phone call. The video lasts approximately thirty seconds and shows Canady and Evans together doing a voiceover with a rap song playing in the background. At one point, Canady and Evans rap the words, "Respect . . . you gotta earn," followed by two names, one of which sounds like "Tezzo," followed by the words, "They got hit." The video contains other lyrics about violence and also shows Canady and Evans rapping "gang, gang, gang," Canady displaying tattoos on his hand, and Evans fanning out cash in his hands.

Additionally, the district court over objection allowed the State to introduce a Snapchat photo posted by Evans.[3] The photo, posted on April 30 at around

---

[2]Evans was charged and tried separately.

[3]The Snapchat photo was posted as a "story," which meant that it could be viewed for twenty-four hours by anyone on Evans's "friends" list, which included Canady and Goodman.

7:30 p.m., showed Evans and J.H. together standing face forward and J.H. gesturing toward an object in Evans's waistband that could be a revolver. The caption read, "We bussing but don't think shit sweat." The caption included a gun emoji. Goodman testified that she pulled up this photo on Evans's Snapchat account at around 3:30 a.m. on May 1 when she was waiting at the hospital where Harrison had been taken.

While on the stand, Goodman also gave her interpretation of some of the expressions used in the jail phone call and the Snapchat photo. Here too, Canady mostly lodged timely objections. Goodman testified that "tax time," as heard in the jail call, meant "taking him for everything he gots; as in his pockets, everything, fighting him, whatever it takes at this point. That's what tax season means." Concerning the caption in the Snapchat photo, Goodman stated, "I'm pretty sure he meant sweet. But, basically, [it means] they got the guns and they're not sweating shit." She elaborated a moment later: "[I]t means that they got guns and they're going to shoot whoever. . . . They're not scared of anything."

Canady did not dispute at trial that he had physically assaulted Harrison outside the bar. His defense was that he did not anticipate Evans shooting Harrison. Canady's defense, in other words, was that he did not intend for anyone to kill Harrison that night and wanted only to fight him.

The jury ultimately acquitted Canady of murder, but found him guilty of a lesser included offense of voluntary manslaughter, *see* Iowa Code § 707.4, willful injury causing bodily injury, and assault causing bodily injury. Canady was sentenced to ten years, five years, and one year imprisonment respectively, the terms to be served consecutive to each other.

Canady appealed, and we transferred the case to the court of appeals. Canady's appeal primarily raises a series of evidentiary issues. He argues that the district court erred in admitting the jail call from Rockwood, the cell phone

rap video, and the Snapchat photo. He also maintains that Goodman's interpretations of slang lacked the proper foundation and amounted to improper expert testimony. Canady further contends that the evidence was insufficient to sustain his voluntary manslaughter conviction, the voluntary manslaughter and willful injury convictions should have merged, and the district court abused its discretion in considering the minutes of testimony during sentencing and in imposing consecutive sentences.

The court of appeals found merit to two of these arguments, and therefore reversed and remanded for a new trial. Specifically, the court determined that the cell phone rap video should have been excluded under Iowa Rule of Evidence 5.403 because its probative value was substantially outweighed by the danger of unfair prejudice. In the court of appeals' view, "the evidence actually introduced at trial was devoid of anything suggesting Canady had the motive or intent to kill Harrison before he received the phone call from Rock[wood] on April 30." Given that the video had been made on April 26, the court concluded that it had "little to no probative value." On the other hand, the risk of unfair prejudice was high because the video "shows Canady rapping along to lyrics involving violent imagery" and "may have suggested to the jury that Canady was a member of a gang."

In addition, the court of appeals concluded that the Snapchat photo should have been excluded because it was not relevant and posed a high risk of unfair prejudice. As the court of appeals explained, "Canady is not in the photo, and there is no evidence he was ever even aware of its existence." On the other hand, the photo, especially with the benefit of Goodman's interpretation, conveyed a message that the group owned guns and was willing to use them.

We granted the State's application for further review.

### III. Standard of Review.

"We review the district court's evidentiary rulings for abuse of discretion. Rulings on the admissibility of hearsay evidence are reviewed for correction of errors at law." *State v. Thompson,* 836 N.W.2d 470, 476 (Iowa 2013) (citation omitted). "We review sufficiency of the evidence claims for correction of errors at law." *State v. Crawford,* 974 N.W.2d 510, 516 (Iowa 2022). Finally, "[w]e review the district court's sentence for an abuse of discretion." *State v. Hill,* 878 N.W.2d 269, 272 (Iowa 2016) (quoting *State v. Barnes,* 791 N.W.2d 817, 827 (Iowa 2010)).

### IV. Legal Analysis.

**A. Admission of the Recorded Jail Phone Call.** Canady contends that the district court erred in admitting the recording of the phone call placed by Rockwood from the Woodbury County Jail. He claims that the State failed to establish proper foundation for the recording and that the call was inadmissible hearsay.

At trial, the State used a belt-and-suspenders approach to lay foundation for admission of the recording. A sergeant from the Woodbury County Jail testified as to the process used by the jail for recording calls. He also testified that Rockwood placed the call in question and to the actual phone number that Rockwood dialed. Later, a detective testified that this particular phone number belonged to Canady. Additionally, Goodman testified that she knew both Rockwood and Canady, had spoken to both on the phone in the past, and would be able to identify their voices in a recording. After listening to the recorded call at trial, she confirmed that the pair were speaking to each other. All this was more than enough to lay foundation for admission of the recorded call. *See* Iowa R. Evid. 5.901(*a*), (*b*)(5)–(6) (requiring the proponent to "produce evidence sufficient to support a finding that the item is what the proponent claims it is" and listing as examples opinions identifying a person's voice and evidence that

a phone call was made to the number assigned to the person if circumstances show the person answering was the one called).

Nor was there a hearsay problem. Canady's statements on the call were party admissions. *See id.* r. 5.801(*d*)(2)(A). Rockwood's statements also fell outside the hearsay rule. Most were not offered for the truth of the matter asserted. *See id.* r. 5.801(*c*)(2). For example, it didn't matter whether Harrison had *actually hit* Rockwood's girlfriend with a bottle. Other statements were adoptive admissions. *See id.* r. 5.801(*d*)(2)(B). To illustrate, after Rockwood said it was "tax time," Canady agreed it was "tax time." No error occurred in the admission of the recorded phone call.

**B. Admission of the Cell Phone Rap Video.** Canady urges that the cell phone rap video should have been excluded under Iowa Rule of Evidence 5.403. "Courts should use rule 5.403 sparingly since it allows for relevant evidence to be excluded." *State v. Buelow*, 951 N.W.2d 879, 889 (Iowa 2020). We first consider the potential relevance of the video. "Iowa has adopted a broad view of relevancy," and it "is a legal question lying within the broad discretion of the trial court." *State v. Thompson*, 954 N.W.2d 402, 407 (Iowa 2021) (first quoting *State v. Scott*, 619 N.W.2d 371, 375 (Iowa 2000) (en banc); then quoting *State v. Tracy*, 482 N.W.2d 675, 680–81 (Iowa 1992) (en banc)).

The State argues that the video was relevant because it showed Canady may have had an intent and motive to kill Harrison that predated the jail phone call with Rockwood on April 30. In the video, Canady and Evans together rap lines about a "Tezzo" getting "hit." As the prosecution put it in closing argument, "[O]ut of all the rap songs on YouTube, Lawrence Canady chose that rap song that talked about killing Tezzo."

Canady questions the relevance of the video by noting that the original song was a well-known rap song that already included a reference to a

"Teso/Tezzo."[4] He also points out that there was no other evidence that Canady formed an intent to harm Harrison prior to April 30.

Canady's arguments may diminish the relevance of the video, but they do not undermine it. Evidence that Canady and Evans harbored animosity toward Harrison on April 26 wasn't necessarily inconsistent with, and indeed could have bolstered, the State's primary theory that they decided to go forward with killing Harrison a few days later after the jail call with Rockwood. On the April 30 phone call, Canady was very quick to agree with Rockwood that "tax time" had arrived, as if there might be some other motive to harm Harrison lurking in the background. After all, it wasn't Canady's girlfriend who had been hit with a bottle.

Moreover, the fact that the original song referred to a "Tezzo" wasn't brought to the district court's attention when it ruled on the objection. *See State v. Morrison*, 323 N.W.2d 254, 256 (Iowa 1982) (defining an abuse of discretion as "one clearly against the logic and effect of facts and circumstances before the court" (emphasis added) (quoting *Best v. Yerkes*, 77 N.W.2d 23, 32 (Iowa 1956))). Even if it had been, the State was entitled to argue that Canady and Evans decided to *select* that song for their short rap because it referenced a "Tezzo."

Of course, even if relevant, the cell phone video would still be inadmissible "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Iowa R. Evid. 5.403. "Weighing probative value against prejudicial effect 'is not an exact science,' so 'we give a great deal of leeway to the trial judge who must make this judgment call.' " *State v. Lacey*, 968 N.W.2d 792, 807 (Iowa 2021) (quoting *Thompson*, 954 N.W.2d at 408).

---

[4]During Canady's defense, the underlying video came into evidence. Canady proved that the video referred to a "Teso" and that it had had approximately 650,000 views.

Canady and amicus American Civil Liberties Union argue that injecting rap music into a criminal trial can be highly prejudicial. They contend, for example, that jurors are more likely to treat a defendant's recital of rap lyrics literally and to associate rap music with criminal activity.

Other courts considering these risks have insisted on evidence tying the rap music to the specific circumstances of the charged crime. *See, e.g.*, *United States v. Sims*, 11 F.4th 315, 323 (5th Cir. 2021) ("The general conclusion from courts that have considered this type of evidence is that explicit rap videos are probative and outweigh substantial prejudice when the defendant performs the song, describes events closely related to the crime charged, and the evidence is not cumulative."); *United States v. Pierce*, 785 F.3d 832, 836, 840–41 (2d Cir. 2015) (holding that a rap video was properly admitted when the defendant was charged with gang-related crimes and rapped in the video about his gang association); *United States v. Wiley*, 610 F. Supp. 3d 440, 446 (D. Conn. 2022) ("[S]tatements or images with offense-specific content tending to corroborate the Government's other evidence . . . will be admitted."); *Bey-Cousin v. Powell*, 570 F. Supp. 3d 251, 255 (E.D. Pa. 2021) (setting forth "a presumption that artistic expression is not factual," and allowing "the proponent of evidence [to overcome the presumption by] offer[ing] some preliminary indicia that the artistic expression is a truthful narrative"); *Wilson v. State*, 883 S.E.2d 802, 813 (Ga. 2023) ("The video shows the defendants boasting about making money in a violent drug trade, but they were charged with robbing a drug dealer shortly before the video was made. This is not a question of evidence that could inflame the passion of the jury for a reason that is irrelevant to the guilt or innocence of the defendant."); *Greene v. Commonwealth*, 197 S.W.3d 76, 86–87 (Ky. 2006) (determining that a video showing the defendant rapping about killing his wife was admissible because he was on trial for her murder); *Holmes v. State*, 306

P.3d 415, 420 (Nev. 2013) (finding the probative value of rap lyrics was not substantially outweighed by a risk of unfair prejudice where "only a single stanza from [the defendant-authored rap] was admitted against [the defendant]—and the stanza that was admitted relayed facts quite similar to the crime charged").

Courts have concluded that rap music evidence should be excluded when the link to the defendant or charged crime is attenuated. *See, e.g., United States v. Gamory*, 635 F.3d 480, 493 (11th Cir. 2011) (finding the probative value of a rap video to be low when the defendant was not in the video and there was no evidence that he wrote the lyrics or he shared the views expressed in the video); *United States v. Johnson*, 469 F. Supp. 3d 193, 221–22 (S.D.N.Y. 2019) (excluding rap evidence because "the Government ha[d] not demonstrated that the lyrics contain any direct references to the [defendant's supposed gang] or to gang activity" where the defendant was charged with various gang-related crimes); *Hannah v. State*, 23 A.3d 192, 195–96, 201–02 (Md. 2011) (holding that rap lyrics "were probative of no issue other than the issue of whether [the defendant] has a propensity for violence," when the defendant's lyrics focused on gun violence in general rather than the specific shooting at issue); *Commonwealth v. Gray*, 978 N.E.2d 543, 559–62 (Mass. 2012) (deciding that a rap video should have been excluded when offered to prove the defendant's gang membership and "[t]he lyrics show[ed] no connection to the defendant that would suggest they were biographical or otherwise indicative of his own motive or intent at the time of the shooting"); *State v. Skinner*, 95 A.3d 236, 252 (N.J. 2014) ("[A]bsent such a strong nexus to defendant's charged crime, his fictional expressive writings are not properly evidential."); *State v. Cheeseboro*, 552 S.E.2d 300, 313 (S.C. 2001) (finding that rap lyrics should not have been admitted because "[u]nlike [other evidence at trial that] contain[ed] identifying details of the crimes committed, these lyrics contain[ed] only general references glorifying

violence"); *In re Pers. Restraint of Quintero*, 541 P.3d 1007, 1033–34 (Wash. Ct. App. 2024) ("Because neither rap lyric has a strong factual nexus to the Walnut Street murders, their prejudicial effect substantially outweighed their probative value.").

Here, any prejudice from the video must be viewed in the context of this particular case. It wasn't disputed at Canady's trial that Canady beat up Harrison while Evans fatally shot him. All of that was captured on video. The issue was whether Canady knew or intended that Evans would kill Harrison. In that regard, Canady's counsel emphasized at closing argument that Harrison was Canady's friend and that they had had physical altercations before and always made up their differences. He pointed out that Harrison and Evans were not friends. Counsel also characterized the events as Canady and Harrison "got into a fistfight on the street and . . . out of nowhere [Evans] approaches them and . . . just shoots [Harrison]." Thus, the State's case came down to showing that Canady and Evans were *collaborating* that night against Harrison.

When the case is viewed through this prism, which is the one the trial judge correctly applied, the prejudicial effect of the video goes down and its probative value goes up. The tendency to infer that someone committed a particular act of violence because that person rapped about acts of violence is less of a concern when the acts of violence and who committed them are *undisputed*. At the same time, the joint conduct and statements on the video were helpful to rebut the notion that Evans acted alone in shooting "Tezzo" without Canady's knowledge or approval.

Likewise, while "gang, gang, gang" in other contexts could certainly be highly prejudicial, here the State didn't try to use any whiff of gang involvement

to prove motive or responsibility for these acts of violence.[5] This case was more straightforward because the acts and who committed them were recorded on video. What mattered to the State was simply that the video showed the defendant and the shooter jointly voicing a threat to "Tezzo."

Finally, as the State notes, Canady was acquitted of murder. The jury rejected both the State's aiding and abetting and its joint criminal conduct theories against Canady. Instead, Canady was convicted only of voluntary manslaughter, on the basis that he aided and abetted the fatal shooting, but the shooting occurred under sudden passion resulting from serious provocation. That verdict suggests that the jury put aside any inference of advance planning from the cell phone video. Rather, the jury must have determined that Canady and Evans acted in concert outside the bar—a relatively straightforward inference to make from the surveillance video, Anderson's testimony, and Goodman's testimony—but that the situation was provoked by Harrison and there was no *advance* plan to kill or harm him. We hold the district court did not abuse its discretion in admitting the cell phone video.

**C. Admission of the Snapchat Photo.** Canady argues that the Snapchat photo should not have been admitted because it was hearsay and any probative value was substantially outweighed by the danger of unfair prejudice. Before trial, the court reserved ruling on whether the Snapchat photo would be admissible.[6]

---

[5]Nor did Canady ask for those words to be redacted. *See State v. Fontenot*, 958 N.W.2d 549, 563 (Iowa 2021) (discussing the defendant's failure to request redactions from an otherwise admissible exhibit).

[6]At the same time, the district court ruled that a number of other social media posts or texts would not be admissible. These included a "death rap" modified by Evans at 8:13 p.m. on April 30 that mentioned "someone gonna die" and indicated that "L" (Canady) was a participant, photos showing Evans posing alone with the revolver used to kill Harrison, and a post by a relative of Canady offering that revolver for sale about twelve hours before the killing.

The moment for that determination came in the midst of Goodman's testimony. The State made an offer of proof out of the presence of the jury. Goodman testified that Canady and Evans both had Snapchat accounts and that she was Snapchat "friends" with both of them. While at the hospital waiting for the doctors attending to Harrison, Goodman pulled up the photo from Evans's account showing Evans posing with J.H. while J.H. was pointing to an object in Evans's waistband. The photo also contained a gun emoji and the caption read, "We bussing but don't think shit sweat." A timestamp indicated that the video had been posted approximately six hours before Evans shot Harrison. Goodman also testified that when she accessed Canady's Snapchat account, she learned that he had been using Snapchat that evening. The district court ruled that the Snapchat photo could come into evidence.

The district court allowed the Snapchat photo into evidence on the ground it was the statement of a coconspirator in furtherance of the conspiracy. *See* Iowa R. Evid. 5.801(*d*)(2)(E) (providing that "[a]n opposing party's statement" is not hearsay if it "is offered against an opposing party and . . . [w]as made by the party's coconspirator during and in furtherance of the conspiracy"). It reasoned that the State had proved by a preponderance of the evidence that a conspiracy to harm Harrison existed by the time the photo was posted, after the Rockwood phone call. We do not address this determination because we conclude that the Snapchat photo was admissible anyway either as nonhearsay or as "[a] statement of the declarant's then existing state of mind (such as motive, intent, or plan)." *Id.* r. 5.803(3).

Putting aside the caption and the gun emoji, the photo itself appeared to show Evans posing with a gun. This image wasn't hearsay because it wasn't a statement offered to prove the truth of the matter asserted. *See id.* r. 5.801(*c*)(2).

Meanwhile, the caption and the gun emoji were, in effect, a statement of intent or willingness to use a gun. *See id.* r. 5.803(3) (providing that "[a] statement of the declarant's then existing state of mind" is "not excluded by the rule against hearsay"); *State v. Thompson*, 982 N.W.2d 116, 119, 121–24 (Iowa 2022) (holding a victim's statements on social media that she feared the defendant admissible under the state-of-mind exception). So they weren't inadmissible hearsay, either.

And in any event, the point of the exhibit as a whole was not to show that Evans had a gun and was willing to use it. *See* Iowa R. Evid. 5.801(*c*)(2). After all, his use of a gun was not disputed at trial. The point of the exhibit was to show that Canady *would have known* Evans had a gun and was willing to use it. *See id.* So again, we do not view the Snapchat photo as hearsay. *See id.*

Of course, the Snapchat photo would still need to be relevant, *id.* r. 5.401, and its ultimate admission would be subject to rule 5.403 balancing. We agree with the State that it passed those screens. Canady and Evans were best friends and both of them were active on Snapchat that night. Thus, a jury could infer that Canady saw the Snapchat photo and thus would have been aware that Evans had a gun and was ready and willing to use it. This would tend to rebut Canady's defense that he did not know Evans had a revolver or planned to use it.

Additionally, there was little risk of unfair prejudice. *See id.* r. 5.403. Canady was free to argue—and did argue—that the State failed to connect him to the photo. As his attorney said in closing, "There's no social media post or photo showing [Canady] with a gun or [Canady and Evans] and the gun, you know, even after all this forensic examination of their phones . . . ." Furthermore, as noted, the evidence at trial was undisputed that Evans did in fact shoot and kill Harrison a few hours after the Snapchat photo was posted. Thus, there was

no risk that jurors would give an unduly literal interpretation to a posting that was not meant to be taken that way. For these reasons, we conclude there was no error in the admission of the Snapchat photo.

**D. Admission of Goodman's Testimony on the Meaning of Various Slang Phrases.** Canady maintains that Goodman's testimony on the meaning of "tax time" from the jail phone call, and "[w]e bussing but don't think shit sweat" from the Snapchat photo, should not have been permitted. He contends it was opinion testimony that lacked a proper foundation.

While we agree with Canady that the meaning of these terms may have been beyond the ken of the average juror, that does not mean it was error for Goodman to define them. Iowa Rule of Evidence 5.701 allows lay witnesses to offer opinions based on their own perceptions if helpful to a jury. Iowa Rule of Evidence 5.702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

Goodman knew Canady, Rockwood, and Evans. She knew Rockwood "very well," having taken care of him for a year and a half. Regarding "tax season" and "tax time," she testified based on her knowledge that Canady and Rockwood meant "taking him for everything he gots . . . whatever it takes." Goodman also testified, initially without objection, that the caption on the Evans Snapchat photo meant "they got the guns and they're not sweating shit." Later, over objection, she testified that it meant to her that "they got guns and they're going to shoot whoever. . . . They're not scared of anything."

In our view, this testimony was proper lay testimony. Goodman wasn't testifying as an outside expert; rather, *as someone who personally knew the*

*speakers*, she was testifying as to what she believed they meant by certain slang terms. *See id.* r. 5.701; *see also United States v. Smith*, 640 F.3d 358, 365 (D.C. Cir. 2011) (Kavanaugh, J.) (stating that the line between expert and lay testimony in this regard should be drawn between "knowledge derived from previous professional experience" and personal knowledge); *United States v. Saulter*, 60 F.3d 270, 276 (7th Cir. 1995) (holding that a drug dealer who was a member of the same organization could offer his interpretation of terms used in recorded conversations because "Rule 701 does not require that the witness actually have participated in the recorded conversations. We believe it sufficient that the witness has personal knowledge of the subject discussed and the persons involved"). The district court did not abuse its discretion in admitting Goodman's interpretations of Canady's, Rockwood's, and Evans's statements.

**E. Sufficiency of the Evidence for the Voluntary Manslaughter Conviction.** Canady asserts that the evidence was insufficient to support a guilty verdict on the voluntary manslaughter charge. When considering the sufficiency of the evidence, the question is "whether, taken in the light most favorable to the State, the finding of guilt is supported by substantial evidence in the record." *Crawford*, 974 N.W.2d at 516 (quoting *State v. Kelso-Christy*, 911 N.W.2d 663, 666 (Iowa 2018)).

Canady contends the evidence does not establish the element that he aided and abetted Evans in the shooting of Harrison. We disagree. The jury was instructed:

> "Aid and abet" means to knowingly approve and agree to the commission of a crime, either by active participation in it or by knowingly advising or encouraging the act in some way before or when it is committed. Conduct following the crime may be considered only as it may tend to prove the defendant's earlier participation. Mere nearness to, or presence at, the scene of the crime, without more evidence, is not "aiding and abetting." Likewise,

mere knowledge of the crime is not enough to prove "aiding and abetting."

Canady told Rockwood on April 30 that he would "slam [Harrison] dead on his fucking head." That night, Canady and his friends arrived at Uncle Dave's Bar looking for Harrison. Canady was the leader and the spokesperson for the group. Canady told the bartender he had a gun and told Harrison he was waiting outside for him. Later Canady directed Evans to "just go ahead and get that"—a statement that Goodman took as a reference to retrieving a gun. Soon, Canady got into a physical altercation with Harrison and seemingly drew him out into the street. When Evans fired the first shot at Harrison, Canady did not react and continued to beat Harrison as Evans fired the second shot. Before leaving the scene, Canady proceeded to kick Harrison as he lay on the street suffering from two gunshot wounds.

Based on the foregoing, a jury could readily find that Canady aided and abetted Evans's shooting of Harrison.

**F. Merger Issue.** Canady argues that the sentencing court should have merged the voluntary manslaughter and the willful injury causing bodily injury convictions. For willful injury causing bodily injury, the State had to prove that Canady "punched and kicked Martez Harrison," that Canady "specifically intended to cause a bodily injury to Martez Harrison," and that Canady "caused a bodily injury to Martez Harrison." For voluntary manslaughter, the State had to prove that Canady "aided and abetted Dwight Evans in shooting Martez Harrison with a gun," that "Harrison died as a result of being shot," and that "[t]he shooting was done solely by reason of sudden, violent and irresistible passion resulting from serious provocation."

We agree with the State that the offenses do not merge. The State cites *State v. Ceretti,* 871 N.W.2d 88 (Iowa 2015). That case involved a fatal stabbing.

*Id.* at 89. The defendant was originally charged with first-degree murder but accepted an agreement to plead guilty to voluntary manslaughter, attempted murder, and willful injury causing serious injury. *Id.* at 89–90. He appealed, arguing that the three convictions should merge. *Id.* at 91.

We observed that "the elements plainly do not align" among the three charges. *Id.* at 92. We specifically noted that "willful injury requires a specific intent to injure, whereas voluntary manslaughter does not require any specific intent." *Id.* Ultimately, we vacated the plea agreement, but only because the voluntary manslaughter and the attempted murder convictions could not coexist under a variant of the one-homicide rule. *Id.* at 96–98.

This is an easier case for nonmerger than *Ceretti* because the voluntary manslaughter count involved the defendant's alleged aiding and abetting of another person's shooting of the victim, and the willful injury count involved the defendant's own alleged beating of the victim.

The defendant argues that his criminal conduct constituted a single "continuous act," with no "break in the action," citing *State v. Velez*, 829 N.W.2d 572, 581–84 (Iowa 2013). But in *Velez* we were analyzing whether the defendant could be convicted of "multiple violations of the same statute." *Id.* at 581. That isn't the situation here. Here we have two different statutes, so the key question to be answered is whether the elements of the offenses overlap.

The defendant also invokes *State v. Walker*, 610 N.W.2d 524 (Iowa 2000) (en banc). There we held that the defendant, who had beaten and kicked the decedent to death, could be convicted of both voluntary manslaughter and willful injury. *Id.* at 526–27. We gave the following explanation for that outcome: "Because the record establishes more than one assault, the court was authorized to impose more than one sentence." *Id.* at 527. Canady argues that *Walker* dictates a different outcome here because there was only one assault. Even if the

explanation in *Walker* were still good law after *Ceretti*, the present case is different because Canady was convicted of *aiding and abetting* Evans's shooting and committing his own willful injury *as a principal*.

**G. Minutes of Testimony Referred to at Sentencing.** Prior to actually pronouncing sentence, the district court stated,

> Before determining the appropriate sentence to impose in these matters, the Court has considered all of the information presented to it. It gives great consideration to the victim impact statements presented here today, as well as all the information contained in the court file, the minutes of testimony, the evidence that was presented during the jury trial in this particular case. The Court has considered all available sentencing options to it under applicable law.

Canady seizes on the reference to "minutes of testimony" and argues that resentencing is required because the court considered an improper sentencing factor. *See State v. Lovell*, 857 N.W.2d 241, 242–43 (Iowa 2014) (per curiam). "Information contained in the minutes of testimony is not a permissible sentencing consideration if unproven." *Id.* at 243. Of course, Canady is correct that his case went to trial and the minutes themselves were not admitted to by the defendant or put into evidence. However, it is the defendant's burden to affirmatively demonstrate that the sentencing court relied on an improper factor. *State v. Damme*, 944 N.W.2d 98, 106 (Iowa 2020). We conclude the defendant has not met that burden.

In this case, the district court did not stop after making the statement quoted above. It went on to pronounce sentence and then provided the following explanation:

> The Court finds that the foregoing sentences imposed would provide for the maximum opportunity for the rehabilitation of the defendant and also significantly to protect the community from further offenses by the defendant and others. The Court has considered the defendant's age, the defendant's prior record, which is extensive in light of the fact that he's only 21 years of age, the

nature of the offenses committed, the fact that force and a weapon was involved in the commission of these crimes, and the Court, again, orders that the foregoing sentences be ordered to be served consecutively based upon the separate and serious nature of the offenses as well as the fact that the offenses in FECR112015 were committed while the defendant was on parole -- or excuse me, probation in File FECR105921.

The court's explanation is complete in itself and does not mention an improper factor. We are not persuaded that the district court considered any unproven facts in the minutes of testimony. We trust that sentencing courts will "filter out" any improper or irrelevant material in victim-impact statements absent clear evidence to the contrary. *State v. Sailer*, 587 N.W.2d 756, 764 (Iowa 1998). Likewise, despite what appears to have been a verbal slip of the tongue, we trust that the district court, which did a thorough and careful job of presiding over this trial, filtered out anything in the minutes of testimony that wasn't actually proved at trial.

**H. Consecutive Sentences.** Canady contends that the district court gave inadequate reasons for imposing consecutive sentences. *See Hill*, 878 N.W.2d at 274–75 (holding that the sentencing court must state reasons for imposing consecutive sentences, but the reasons can be the same as the reasons for the underlying sentence). We disagree. The court stated that it was imposing consecutive sentences "based upon the separate and serious nature of the offenses as well as the fact that the offenses in FECR112015 were committed while the defendant was on . . . probation." This was an adequate explanation.

**V. Conclusion.**

For the reasons stated, we vacate the decision of the court of appeals and

affirm Canady's convictions and sentence.[7]

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

---

[7]We deny Canady's motion to strike the State's notice of additional authorities as allegedly containing improper "argument." *See* Iowa R. App. P. 6.908(5) ("No further argument may be included in the notice."). The State's notice of authorities was filed in response to the amicus brief. Both parties had previously been given leave to file a response to the amicus brief. The State apparently chose to file its response in the form of a list of eight authorities, with either a quotation or a descriptive parenthetical for each authority.